UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH K. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:13 CV 3 AGF / DDN |
| | ) | |
| CAROLYN W. COLVIN,[1] | ) | |
| Acting Commissioner of Social | ) | |
| Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Deborah K. Williams for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401, <u>et seq.</u>, and for supplemental security income (SSI) under Title XVI of the Act, § 1381, <u>et seq.</u> The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the decision of the Administrative Law Judge (ALJ) be affirmed.

**I. BACKGROUND**

Plaintiff, who was born on September 30, 1965, filed her applications for DIB and SSI on January 8, 2010, alleging disability due to kidney problems, blockage in her urethra, high cholesterol, migraine headaches, and back pain. (Tr. 30-31, 121-31, 199.) She alleged

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. F.R.Civ.P. 25(d).

a February 9, 2009 onset date of disability. (Tr. 31, 121, 128, 193.) Her applications were denied initially, and she appealed to an ALJ. (Tr. 72-73.) On April 26, 2011, following an administrative hearing, an ALJ found plaintiff not disabled. (Tr. 7-16, 21-53.) On November 7, 2012, the Appeals Council denied her request for review. (Tr. 1-3.) Thus, the ALJ's decision became the final decision subject to judicial review under section 405(g).

## II. MEDICAL AND OTHER HISTORY

Plaintiff has an associate's degree and a certified nursing assistant (CNA) license. (Tr. 29, 200.) She has worked as a nursing aide and home health nurse. (Tr. 201.) On April 26, 2011, the date of the ALJ's decision, plaintiff was forty-five years old. (Tr. 26, 121, 128, 193.)

On June 30, 2005, while employed as a nurse's aid, plaintiff injured her back while attempting to lift a large patient. (Tr. 377.) In August 2005, plaintiff went on a 10-day driving vacation. (Tr. 379.) In October 2005, plaintiff left her job because she felt she could not perform her regular work duties. (Tr. 377.)

From August 19 through October 27, 2005, plaintiff saw Jeffrey Parker M.D., for low back pain, hip pain, and numbness in her right leg. (Tr. 365-76.) Dr. Parker diagnosed severe degenerative disc disease at L4-S1 (lower lumbar spine),[2] with chronic discogenic back pain, i.e., pain that originates in an intervertebral disc. Dr. Parker did not feel that at that time her symptoms warranted a spinal fusion since she had stopped working and her

---

[2]The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2 (25th ed., Williams & Wilkins 1990).

2

pain was better. He recommended a lumbar facet block (a steroid or anesthetic injection) to control her symptoms. (Tr. 367-68.) On August 19, 2005, an MRI revealed plaintiff had a moderate disc herniation, centrally at L5-S1. (Tr. 370.)

On March 13, 2007, Richard Pearson, M.D., conducted an independent medical evaluation for a worker's compensation claim from a June 2005 back injury. He noted plaintiff took over-the-counter anti-inflammatory medications with fair to poor pain relief. Dr. Pearson diagnosed disk herniation and degenerative disk disease in her lower back. He recommended four to six weeks of aggressive physical therapy to increase her flexibility, strength, range of motion (ROM), and activities of daily living. He believed that at that time plaintiff was not able to lift more than fifteen pounds repetitively, sit for longer than forty-five minutes without changing positions, or stand more than thirty minutes. Dr. Pearson believed that she would be a candidate for back surgery if physical therapy did not help. (Tr. 419-26.)

On May 2, 2007, Michael Chabot, D.O., performed a physical evaluation for plaintiff's worker's compensation claim. Plaintiff claimed that her pain worsened with standing, walking, sitting, lying down, resting, coughing, sneezing, and bending forward. Dr. Chabot noted there was no indication in her records of a specific work injury related to her back pain symptoms. An MRI of plaintiff's lower back indicated normal height through the lumbar spine with a normal marrow signal, with evidence of degeneration and moderately large central disc herniation. Dr. Chabot noted that plaintiff had a mostly full ROM, that she moved without difficulty, that she had a normal gait, that she did not use an assistive device to walk, that she could stand and sit without assistance, and that she had no tenderness. Tests revealed she had mostly normal reflexes, full motor strength, intact sensation, and could heel and toe walk. Dr. Chabot also noted that she had no nerve compression in her neck and no hip joint pain. X-rays of plaintiff's lower spine showed normal alignment with evidence of disk space narrowing at two joints, as well as evidence suggesting degeneration at two joints. Dr. Chabot concluded there was no evidence of

"significant physical findings that would preclude her from gainful employment." (Tr. 381, 377-81.)

On February 11, 2009, two days after her alleged disability began, George Aldridge, M.D., placed a stent in plaintiff's right kidney due to right flank pain and urinary incontinence. He diagnosed swelling and blockage of the urethra. (Tr. 274, 279.)

Plaintiff began seeing Milton Eichmann, M.D., in March 2009. On March 2, 2009, Dr. Eichmann reported that plaintiff looked "good," and that she had minimal stent discomfort or right flank pain. On March 31, 2009, plaintiff complained of pain and discomfort from the stent. On April 8, 2009, Dr. Eichmann noted that plaintiff was "doing nicely" with "mild stent concerns," and that an ultrasound "look[ed] good." (Tr. 283-84, 287.)

On April 22, 2009, plaintiff saw Dr. Eichmann for complaints of flank pain, and on April 23, 2009, he removed her stent. Plaintiff's right kidney generally looked "good" except for slow drainage. A CT scan of her right kidney looked "OK," although there was a delay in volume. (Tr. 284-91.)

On May 1, 2009, plaintiff saw Barry Farber, M.D., for right flank pain. She denied having chronic back or neck pain, or sore muscles. Dr. Farber diagnosed hydronephrosis, or swelling of the kidney due to a backup of urine; recommended surgery to create drainage with a temporary stent; and referred her to Sam Bhyani, M.D., a surgeon. (Tr. 324-26.)

On May 7, 2009, Dr. Bhayani indicated that it might be very challenging to correct the blockage on her right side because of all of the blood surrounding the kidney. He noted that plaintiff never had pain on her left side. A biopsy on June 23, 2009, showed no sign of dysplasia or malignancy. (Tr. 331, 338-46.)

On June 28, 2009, Dr. Bhayani inserted stents on both sides. On August 6, 2008, Dr. Bhayani removed plaintiff's left stent. He replaced her right stent on August 6, and again on November 11, 2009. Dr. Bhayani diagnosed restenosis or recurrence of abnormal narrowing of an artery or valve after corrective surgery, on the right side, and advised

4

plaintiff that she might require further stent changes. (Tr. 350-60.)

On July 20, 2009, Dr. Bhayani noted plaintiff reported improved abdominal pain. An August 19, 2009 kidney function test showed that plaintiff had mild impairment on her right side. (Tr. 329, 349.)

On January 7, 2010, plaintiff saw Philma B. Opinaldo, M.D., complaining of right kidney pain. Plaintiff reported that she cannot work since she hurts all the time and that she wanted to apply for disability. She also reported tenderness in her back with certain motions. Dr. Opinaldo diagnosed abdominal pain, a urinary tract infection and obstruction, and instructed her to increase her fluid intake. (Tr. 382-83.)

Plaintiff reported tenderness in her lower back during visits to Dr. Opinaldo on November 29 and December 20, 2010. Dr. Opinaldo that noted she had muscle spasms. She tested negative for a herniated disk. Dr. Opinaldo recommended weight loss, exercise, and hot packs, and prescribed pain medication for her back. Dr. Opinaldo diagnosed an obstructed urethra and generalized osteoarthritis. During a visit on August 16, 2010, plaintiff showed no abnormalities in her lower back. (Tr. 382, 386-92.)

A February 18, 2010 CT scan of plaintiff's abdomen showed changes consistent with her prior procedures. (Tr. 410-12.)

In a work activity report dated January 8, 2010, plaintiff stated she worked as a home health aide from January 2008 through January 5, 2010. (Tr. 183-88.) In a function report dated January 14, 2010, plaintiff reported that she lived alone, cleaned, prepared daily meals, took care of a cat, did laundry, went outside, grocery shopped once a month, knitted, used the computer, and managed her finances. She said she had no difficulty with personal care except that she sometimes needed help getting out of the bathtub. (Tr. 230-34.)

In her disability appeal report, plaintiff stated that it took her longer to do things, that she had trouble keeping up with her housework, and that she could no longer clean her house, hold her grandchildren, or perform yard work. (Tr. 266-67.)

**Testimony at the Hearing**

On April 4, 2011, represented by counsel, plaintiff appeared and testified to the following at an administrative hearing. (Tr. 21-53.) She is 45 years old. She lives with her parents in their home. She is separated and has two grown children from an earlier marriage. She is 5 feet, 6 inches tall, and weighs about 190 to 195 pounds. She worked as a home health care worker in 2009 and for one day in 2010. She is able to drive. She does not have a current source of income and receives food stamps. She injured her back in June 2005 while working as a CNA. She filed a worker's compensation claim for the injury and received a settlement. (Tr. 25-30.)

She has not applied for work since 2010. She cannot work because she cannot bend, lift, or stoop, or sit or stand for very long because it hurts her back. She alleged a February 9, 2009 onset date because her right kidney failed on that day. Her doctor must change her stent every eight to twelve weeks, which involves general anesthesia and surgery. It takes her approximately one week to recover from a stent change. (Tr. 30-32, 46-47.)

She is able to cook for herself, use a computer, wash dishes, make her bed, vacuum, drive, and shop for groceries on occasion. (Tr. 27, 32-33, 49). She watches her nieces play outside, goes out to dinner on occasion, attends a weekly Bible study, reads books, knits, and occasionally watches her grandchild. Her mother usually does her laundry and grocery shopping for her. (Tr. 34-36.)

She takes a muscle relaxant and water pills, as well as medication for migraine headaches, high blood pressure, high cholesterol, pain management, and diabetes. She has been diabetic for about three or four months. She has no side effects from her medication. (Tr. 37-38.)

She has three ruptured disks from her 2005 back injury. Her pain is constant and ranges from 7 to 10 on a ten-point scale. When she takes Tramadol, for pain, her pain level is 4 on a ten-point scale. Her doctors advised her that she cannot have corrective surgery because her spinal canal is too narrow and that she must simply endure the pain. She has not

6

tried physical therapy. She gets up and walks around four or five times a day for thirty minutes to two hours because sitting for extended periods causes pain in her back and hips. She can stand for ten to fifteen minutes, walk one quarter to one half mile, lift 15 pounds, crawl, and occasionally bend and climb stairs. She cannot stoop, crouch, or kneel. Her kidney and the stenting cause pain all of the time. (Tr. 38-45.)

Vocational Expert (VE) Matthew Lampley also testified at the hearing. The ALJ asked the VE to consider a hypothetical claimant of plaintiff's age (45), education ("high school plus"), and past work experience (nurse assistant). The hypothetical question also included the residual functional capacity which the ALJ ultimately found plaintiff to have. The VE testified that the hypothetical claimant could not perform the work of a nurse assistant. But this hypothetical claimant could perform the sedentary jobs of charge account clerk, addresser, and assembler. The VE testified that those positions would not be suitable if the hypothetical claimant needed to lie down 3-4 times per day for approximately one hour at a time. (Tr. 51-52.)

### III. DECISION OF THE ALJ

On April 26, 2011, the ALJ issued a decision that plaintif was not disabled. (Tr. 7-16.) At Step One, the ALJ found plaintiff had not performed substantial gainful activity (SGA) since February 9, 2009, her alleged onset date. At Step Two, the ALJ determined that plaintiff had the severe impairments of degenerative and discogenic back disease, high blood pressure, and urinary tract disorders. At Step Three, the ALJ determined that plaintiff's impairments did not meet or medically equal a listed impairment. The ALJ determined that plaintiff had the RFC to perform sedentary work as defined in the regulations with the following limitations. She could lift 10 pounds occasionally and less than 10 pounds frequently. She could stand for 6 hours, sit for 6 hours, and walk for 6 hours in an 8 hour day. She should avoid ladders, ropes, and scaffolds. She can occasionally climb, balance, stoop, crouch, kneel, and crawl. She cannot have any exposure to vibrations,

7

extreme cold or heat, moving machinery, unprotected heights, and dust, gas, or fumes. At Step Four, the ALJ determined that plaintiff was unable to perform any past relevant work. At Step Five, the ALJ found that plaintiff's impairments would not preclude her from performing work that exists in significant numbers in the national economy, including work as a charge account clerk, addresser, and assembler. Consequently, the ALJ found that plaintiff was not disabled.

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.   42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual is disabled.  20 C.F.R. §§ 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

8

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform her past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to her PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in (1) determining her RFC; and (2) improperly rejecting her testimony at the hearing.

**A.     Residual Functional Capacity (RFC)**

Plaintiff argues that the ALJ erred in determining her RFC by failing to give appropriate weight to Dr. Pearson's opinion and accepting the opinion of a single decision-maker (SDM). She also argues the ALJ relied on no medical evidence in formulating her RFC. The undersigned disagrees.

The ALJ adequately detailed the basis for his RFC finding and gave good reasons for the weight afforded the medical opinions. RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite her limitations, and it must be determined on the basis of all relevant evidence,

9

including medical records, physician's opinions, and a claimant's description of his limitations. Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 416.945(a). While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. An "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at * 7 (Soc. Sec. Admin. July 2, 1996). As part of the overall evaluation of a claimant's allegations, an ALJ weighs the medical opinions of record and resolves any conflicts. See Wagner v. Astrue, 499 F.3d 842, 848-50 (8th Cir. 2007); 20 C.F.R. §§ 404.1527, 416.927.

In this case, after considering the entire record, the ALJ determined that plaintiff could perform sedentary work with additional restrictions, including, among other things, limiting her to standing, sitting, and walking for six hours, and only occasional climbing, balancing, stooping, crouching, kneeling, and crawling.

The ALJ gave great weight to the May 2, 2007 opinion of examining physician Dr. Chabot. Dr. Chabot found no evidence of significant physical findings that would preclude plaintiff from gainful employment. Dr. Chabot's examination showed that plaintiff had mostly a full ROM, a normal gait, mostly normal reflexes, full motor strength, no nerve tingling, and no nerve compression in her neck, and that she did not need assistance to walk, stand, or sit. Dr. Chabot concluded that plaintiff's back pain did not cause debilitating limitations. (Tr. 12, 379-81.)

The ALJ also gave some weight to plaintiff's statements in his RFC finding. Specifically, the ALJ credited plaintiff's testimony that she could walk one quarter to one half a mile and lift fifteen pounds occasionally. In fact, the ALJ limited the total amount of time plaintiff could walk and assigned greater restrictions on the weight that she could lift than what she herself testified to at the hearing. The ALJ also included limitations for

plaintiff's complaints of urinary tract pain, high blood pressure, and degenerative back pain. He restricted plaintiff from ladders, ropes, and scaffolds, and limited her to only occasional climbing, balancing, stooping, crouching, kneeling, and crawling. (Tr. 10-14.)

Plaintiff complains that the ALJ ignored the opinion of examining physician Dr. Pearson. However, the ALJ gave good reasons for discounting Dr. Pearson's opinion. Following his March 2007 examination, Dr. Pearson opined that plaintiff's pain and limitations were not permanent and would improve with treatment. Dr. Pearson believed that at that time plaintiff had not yet had an adequate course of treatment for her lower back pain and therefore recommended four to six weeks of aggressive physical therapy. He believed that back surgery might assist plaintiff if her condition did not improve with physical therapy. He limited his opinion that plaintiff was not able to lift more than fifteen pounds, sit for more than forty-five minutes without changing position, and stand more than thirty minutes to that time. Dr. Pearson made clear that his opinion concerned plaintiff's condition in March 2007 and that he believed her condition would improve with proper treatment. The record supports the ALJ's decision to give Dr. Pearson's opinion little weight. Moreover, the ALJ's RFC finding was more restrictive than Dr. Pearson's opinion because Dr. Pearson opined that plaintiff could not lift more than fifteen pounds, while the ALJ limited plaintiff to lifting no more than ten pounds. (Tr. 12-13, 425-26.)

Plaintiff also contends the ALJ gave too much weight to Dr. Chabot's opinion because Dr. Chabot did not review prior diagnostic and imaging studies. However, Dr. Chabot reviewed roughly the same evidence as Dr. Pearson, but provided a more detailed analysis of all the medical records and went further by identifying other potential records. (Tr. 377-80, 424-25.)

Plaintiff also exaggerates the impact of Dr. Chabot's opinion on the ALJ's RFC finding. The ALJ stated that he gave Dr. Chabot's opinion weight to the extent it represented an "impartial, subjective opinion from a medical professional of the claimant's overall ability to function." (Tr. 12.) The ALJ made his own RFC determination based on

11

all the record evidence, ultimately assigning greater limitations than Dr. Chabot's opinion would support. (Tr. 10, 12-14.)

Plaintiff also argues that the ALJ relied on the assessment of a SDM in reaching his RFC determination. The undersigned disagrees. The ALJ set forth the evidence upon which he relied in making his RFC determination and never referred to the SDM. (Tr. 11-14.) While both the SDM and the ALJ arrived at similar limitations, many of these limitations track the language and definition of "sedentary work" set forth in the regulations. See 20 C.F.R. §§ 404.1567(a), 416.967(a) ("Sedentary work involves lifting no more than 10 pounds at a time . . . , sitting, [and] a certain amount of walking and standing"); SSR 83-10 (sedentary work involves sitting about six hours in an eight-hour workday). Therefore, the ALJ did not err in assigning the same postural and environmental limitations as the SDM provided that these limitations were supported by the record evidence.

Plaintiff also claims the ALJ did not rely on or cite any medical evidence in his RFC finding. Contrary to plaintiff's assertions, as described above, the ALJ explained his RFC determination, including the objective medical record evidence upon which he relied. (Tr. 12-14.)

**B.    Credibility**

Plaintiff argues the ALJ erred in evaluating her subjective allegations regarding her lower back pain. This argument is without merit.

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not for the court. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). If the ALJ discounts a claimant's credibility and gives good reasons for doing so, the court will defer to ALJ's judgment even if every factor is not discussed in depth. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Because the ALJ articulated the inconsistencies on which he relied in discrediting plaintiff's testimony regarding her subjective complaints, and because the credibility finding is supported by substantial evidence on the record as a whole,

the ALJ's credibility finding should be affirmed. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).

Here, the ALJ determined that plaintiff's degenerative back and disk pain, high blood pressure, and urinary tract disorder could impose some limitations. The ALJ did not, however, credit plaintiff's testimony as to the extent of her functional limitations. The ALJ found it significant that objective findings were inconsistent with the severity of her allegations. (Tr. 12). See Forte v. Barnhart, 377 F.3d 892, 895 (8th Cir. 2004) (lack of objective medical evidence is a factor an ALJ may consider when determining credibility). The ALJ noted that although plaintiff alleged disabling back pain, there was no recent record evidence to support those claims. The ALJ noted that an MRI from 2005 showed disk degeneration and herniation in one location; that back x-rays from 2007 showed normal alignment; and that while plaintiff underwent abdominal CT scans for her kidney condition, no such objective procedures were conducted on her back. (Tr. 12, 284, 349, 369-71, 378, 394, 410-11). Therefore, there is no objective record evidence during the relevant time period to support plaintiff's claim of a debilitating back impairment.

The ALJ also noted the medical record evidence showed significant gaps in plaintiff's treatment history. (Tr. 13). The ALJ noted that although plaintiff received treatment for her back in 2005 and 2007, there was no medical evidence that plaintiff was treated for back pain again until 2010. (Tr. 13, 369-71, 378, 382, 389-90, 391-92.) Despite plaintiff's claim that her her right kidney was restented every six to eight weeks, the record evidence showed that her kidney had not been restented since November 2009, one year and a half before her administrative hearing. (Tr. 13, 353-54.) The ALJ also observed that plaintiff saw Dr. Opinaldo, her primary care physician, only five times during 2010, including visits for conditions unrelated to her disability claim. (Tr. 13, 382-92.) The ALJ concluded that plaintiff's infrequent back and kidney treatment tended to discredit her testimony of disabling limitations.

The ALJ also recognized that plaintiff received only conservative treatment for her

13

back. (Tr. 13.) See Growell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (in evaluating credibility, pattern of conservative medical treatment is proper factor for an ALJ to consider). The only treatment that plaintiff received for her back pain was a steroid injection in 2005 and pain medication in November 2010. (Tr. 12, 379, 420.) As recently as January 2010, Dr. Opinaldo recommended that plaintiff lose weight, exercise, and apply heat packs for her pain. (Tr. 390.) This type of conservative treatment does not support her claim of disabling back pain.

Medical opinion evidence also played a significant role in the ALJ's credibility evaluation. (Tr. 12-14.) See 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1) (SSA will consider "medical opinions of . . . treating sources and other medical opinions" when evaluating symptoms). The ALJ credited Dr. Chabot's opinion that plaintiff's back pain would not preclude her from working and noted that Dr. Chabot's opinion tended to discredit the alleged intensity and impact of plaintiff's impairments. (Tr. 12.)

The ALJ also noted that plaintiff continued to work for almost a full year as a home aide after her alleged onset date. (Tr. 14, 183-88.) While the ALJ gave less weight to this inconsistency vis-a-vis other factors, "it nevertheless indicated that her symptoms were not as severe as she alleged." (Tr. 14, 183-88.) See Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (employment after alleged onset date is indicative of ability to work and inconsistent with allegation of disability).

The ALJ also noted that plaintiff went on a ten-day driving trip in August 2005, suggesting that her back pain was not as severe as alleged and which was inconsistent with her claim of severe back problems since June 2005. (Tr. 12, 39, 379, 381). See Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004) (ALJ may disbelieve a claimant's subjective reports of pain because of inherent inconsistencies or other circumstances). The ALJ agreed with Dr. Chabot's opinion that a person with "significant . . . back pain rarely ever tolerate[d] prolonged sitting," such as a ten-day road trip (Tr. 12, 381.)

14

Plaintiff also contends that the ALJ erred in rejecting her testimony concerning how long she could sit, stand, and walk, as well as her need to lie down. However, the ALJ noted that no medical source gave any medical reason for the degree of limitations plaintiff described. (Tr. 14, 40-44.)

The undersigned concludes that the ALJ properly evaluated plaintiff's credibility and that substantial evidence supports the ALJ's finding. Accordingly, the ALJ's credibility finding should be affirmed.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on October 18, 2013.